Gants, J.
The plaintiffs, Eddy Michel (“Michel”) and Lederne Breneville (“Breneville”), have filed suit against their former employer, the defendant Factory Mutual Engineering Corporation (“Factory Mutual”), alleging that Factory Mutual discriminated against them on the basis of their race (African-American) and national origin (Haitian), and retaliated against them because they opposed its discriminatory practices, all in violation of G.L.c. 15 IB, §4. In short, the plaintiffs make three separate allegations:
1. that Factory Mutual failed to act reasonably in addressing the three instances in which racial graffiti targeted at them was written on the walls of the employees’ men’s room;
2. that Factory Mutual harassed them because of their race and national origin, and in retaliation for their complaints about the racial graffiti, by adding new and unpleasant duties to their workday; and
3. that Factory Mutual terminated them from employment because of their race and national origin, and in retaliation for their calling the police to complain about their immediate supervisor’s use of racially denigrating language.
All parties agreed to waive their right to a jury trial, and a bench trial was conducted over six days from August 25 through September 1, 1998. Based on the trial testimony, the exhibits admitted into evidence, and the stipulations of counsel, I make the following findings of fact and conclusions of law.
Findings of Fact
Factory Mutual, based in Norwood, Massachusetts, is primarily in the business of providing certain insurance-related services to the several insurance companies that own it, but it also owns and operates a Conference and Lodging Center (“Conference Center”) at its Norwood headquarters, which provides conference room, dining room, and lodging to any organization looking for conference facilities.
Breneville, an African-American bom and raised in Haiti, began his employment with Factory Mutual on November 17, 1988 as a “coffee server” with a starting salary of $7.25 per hour.[1] His job was to provide coffee and pastries to conference participants in accordance with the wishes of the participants, generally before the morning session began, at mid-morning, and at mid-afternoon. His normal work hours were from 6:30 a.m. until 2:30 p.m., when the evening shift began.
Michel, also an African-American born and raised in Haiti, began work with Factory Mutual in January 1989, also as a coffee server. He received a starting salary of $7.50 per hour, but worked the same hours as Breneville and performed the same tasks.[2]
Both Breneville and Michel are native French-speakers, who speak English with a strong accent. They were less fluent in English when they worked at Factory Mutual, eight years ago, than they are today, having lived in this country continuously since that time. Both are legal resident aliens, lawfully residing and working in the United States.
When they were first employed, both Breneville and Michel reported directly to a group leader, Lisa Barsanti, who reported to Russell Goulet, the Food and Beverage Manager at the Conference Center. Goulet, in turn, reported to Roger Barrett, the Manager of the Conference Center, who reported to Factory Mutual Vice-President Matoon, who reported to Factory Mutual President and Chief Executive Officer, John Love.
When Breneville first began his employment, he was told that, if he performed satisfactorily, he would soon receive a pay raise and Factory Mutual made good on that pledge. On February 6, 1989, Goulet prepared a Promotion Potential Record that gave Breneville a rating of “3A” for his present performance. Under the Performance Appraisal Discussion Guide, a rating of “3A” was defined as: “The rate of learning or success in meeting performance standards is entirely satisfactory.”[3] The Promotion Potential Record was not intended as a performance appraisal but rather was a prerequisite to the approval of a wage increase. Routinely, it was forwarded to Barrett for approval and determination of the amount of the increase. As a result of this Promotion Potential Record, Breneville’s wage increased to $7.59 per hour, effective March 27, 1989.
In June 1989, someone wrote in magic marker on the walls of the bathroom in the locker room used by the Conference Center’s kitchen and maintenance staff, in large letters: “No black people around pool deck.”[4] At the time, the plaintiffs were the only black employees of the Conference Center. They believed the racial graffiti was directed at them, and this both shocked and upset them, since they had never before been the targets of such blatant racial attacks. They reported the graffiti to Goulet, who reported it to the Personnel Division and took steps to have the graffiti promptly removed. Goulet spoke with the plaintiffs about the graffiti, telling them that he sympathized with their distress, that it was wrong for such graffiti to have been written, and that the author must be mentally sick. He asked them if they had any idea as to who may have done it, and they did not. He urged them to put the matter aside and not allow it to interfere with their work.[5] No further action was taken by Factory Mutual.
Around August 1989, someone wrote at the entrance to the same locker room, again in magic marker in large lettering, “We hate wite [sic] people." The plaintiffs again reported the racial graffiti to Goulet. He again took steps to remove it and spoke to them about it in much the same way he had spoken with them after the first incident. This time, however, the *202 Personnel Division took a more active role in managing the problem. Janice Smith (then Factory Mutual’s Manager of Employee Relations), Barrett, and Goulet met with all Conference Center employees in two meetings, one for day staff and the other for evening staff. The message delivered at these two meetings was essentially the same: the employees were told that there had been two racial graffiti incidents, that the writing of such graffiti was wrong and would not be tolerated, that anyone with information as to who was responsible for the graffiti should provide it in confidence, and that the person who wrote the graffiti, when discovered, would be immediately dismissed. Goulet invited Michel to come to the meeting for day employees, but he did not attend, claiming that he was too busy with work and knew what was going to be said. Breneville was not specifically invited by Goulet but he learned of the meeting and chose not to attend; instead, he ate lunch in a separate dining room near the large dining room where the meeting was being held, close enough to see the meeting but not close enough clearly to hear what was being said. '
On September 25, 1989, more racial graffiti was written in the men’s locker room, also in magic marker and large lettering: “We hate black people in our kicten (sic). Fuck you blacks.” The defendants recognized this graffiti to be even more threatening than the despicable graffiti that came before, because it was more violent and personal in its tone, and they feared for their safety. Breneville photographed the graffiti, and Michel telephoned the police. A Norwood police officer came to the Conference Center, observed the graffiti, and prepared a report.
The third racial graffiti incident triggered Factory Mutual to retain a private investigative firm, First Security, to attempt to locate the author of the hateful writings. As part of the investigation, First Security, with the assistance of Factory Mutual personnel, identified the set of people who had access to the locker room at the times in question, obtained handwriting samples, and conducted employee interviews. During the course of the investigation, one of the Conference Center cooks, Gordon Myers, told Goulet that a dishwasher, John Henneberry, had confessed to him and an assistant cook, Sean Green, that he had written the graffiti. After confirming with Myers and Green what Henneberry had told them, Janice Smith and the primary investigator met with Henneberry and his father to confront them with their knowledge of the confession. Henneberry confirmed that he had said he had written the graffiti but claimed he was only joking and had not truly written it. Myers and Green were later interviewed again, and said that Henneberry did not appear to be joking when he told them. Smith discussed the Henneberry situation with Goulet, the Personnel Director, Carol Bois, and Factory Mutual’s legal counsel, Joseph Olshan, and they agreed that Henneberry could no longer remain an employee at Factory Mutual. They decided to offer him what they called “a mutually agreeable separation,” in other words, an opportuniiy to resign, so that if a future prospective employer asked Factory Mutual about him, it could inform that employer that Henneberry had resigned.[6] If he refused to resign, he would be immediately terminated. The basis for the forced resignation was not a finding that Henneberry had written the racial graffiti, because Factory Mutual did not believe at this time it had established that adequately. Rather, the forced resignation was based on the disruption in the workplace he had caused by his confession and the obnoxious sexual comments that his co-workers had confirmed he had made. Goulet and Smith met with Henneberry on November 13, 1989, explained Factory Mutual’s position, and described his options. Henneberry opted for the mutually agreeable separation.
Henneberry’s resignation did not end the investigation into who had written the racial graffiti. The plaintiffs soon learned of Henneberry’s resignation, and they asked to meet with Smith about it, which they did on November 14. The plaintiffs asked Smith if Henneberry had been fired, and Smith could say only that he had left the organization. The plaintiffs did not believe that Henneberry was the author of the graffiti; they thought that Factory Mutual had fired the wrong person. They told Smith that they had more information regarding the graffiti, which they would tell the private investigator but not her. Smith arranged a meeting between the plaintiffs and the investigators that was held the following day. At this meeting, the plaintiffs were interviewed separately and claimed that they did not have any information to offer, but that Henneberry did not do it.[7] When the handwriting examiner completed his final report, concluding that Henneberry had written the third graffiti, Smith, Bois, and Olshan decided to declare the investigation over, satisfied that they had identified the wrongdoer.
Meanwhile, on July 17, 1989, Jorge Darocha, previously the head cook, became the Group Leader who directly supervised the plaintiffs.[8] Within a short time, Darocha required the plaintiffs to perform tasks that they had not been asked to perform before, and that did not relate directly to their primary job of serving coffee and pastries. Among the additional duties Darocha made them perform were cleaning up after the afternoon break (which previously had been done by the night cook), cleaning up the storage area, bringing juice from the truck dock into the storage area, empiying the trash in the kitchen, and cleaning up the salad bar. In short, Darocha treated them more like utility workers rather than pure coffee servers, which is how they viewed their responsibilities. The plaintiffs considered these additional duties to be beyond the requirements of their job and, at times, demeaning and unsanitary.[9]
There is no evidence that the plaintiffs ever complained about these new responsibilities, but there is *203 evidence that their unhappiness at work (with their supervisor, the racial graffiti, and the investigation of the graffiti) affected the performance of their job. Goulet believed that Breneville and Michel performed relatively well when they first started but that their performance markedly slipped beginning in the summer of 1989. The evidence supports the conclusion that their performance began to slip in September 1989.
Goulet kept personnel files of employees under his direction, and made it a practice to make and keep notes of an employee’s performance problems in that employee’s personnel file. He also made it a practice to speak with an employee about a problem noted in his personnel file. He followed this practice with the plaintiffs. These files reflect that Goulet’s first note of criticism of the plaintiffs was dated March 24, 1989, focusing on problems with them starting and leaving early, and with their coffee being too strong. More problems were noted on September 12, 13, and 18— before the third graffiti incident and the first arrival of the police. The criticism increased in frequency in October and November 1989, focusing generally on complaints about their performance, unexcused absences and tardiness, and failure to take direction. On or shortly after November 17, 1989, Goulet, with the assistance of Smith, drafted a letter to Breneville criticizing him for having left his work area to see the nurse without letting his supervisor know, resulting in a customer group not receiving their coffee for their break. The letter warned him that, if he did this again, he would be given a three-day suspension without pay. There is no evidence that this happened again, and Breneville was never suspended. However, on December 11, 1989, a Conference Center group was going somewhere by bus and wanted their morning coffee brought onto the bus. Breneville refused to deliver the coffee, claiming that he did not think he should be doing this task.
Although Goulet was unhappy with the plaintiffs’ job performance, he did not, prior to December 27, 1989, believe their performance to be so poor as to warrant their termination and never recommended their termination. Rather, his practice as a supervisor at Factory Mutual was to consider termination as a last resort following continued poor performance. Before he would consider termination, he would discuss the employee’s problems with him, give an oral warning if problems persisted, move to a written warning if the oral warning did not produce results, and then, if that had failed, contemplate termination. Not only had neither of the plaintiffs reached the end of this rope, but Goulet did not think that the plaintiffs’ performance, especially considering the effect the graffiti may have had on their performance, was so unsatisfactory as to demand their dismissal.
Indeed, on December 21, 1989, Goulet prepared a Promotion Potential Record on behalf of Michel, which effectively recommended that he receive a raise of unspecified amount. In this Record, Goulet wrote that the rating that best represented Michel’s overall job performance was a “3A,” the same satisfactory rating that he had given Breneville in February 1989. While this may have been a generous appraisal of Michel’s performance intended to help justify a raise, Goulet conceded that, if this had been an actual performance appraisal, he would have rated him between a “3A” and a “4A,” the latter signifying that “(t]he rate of learning or success in meeting performance standards does not fully meet requirements and needs improvement.” He does not contend that the proper rating would have been the lowest, “5A”: “[t]he rate of learning or success in meeting performance standards is substantially below requirements and requires significant improvement.” Apart from the actual rating, this Promotion Potential Record demonstrates that Goulet anticipated that Michel would and should remain with Factory Mutual; he recommended an increase in pay based on the belief that Michel was being paid less than Breneville and the prevailing wage for this job, and deserved more. While it would be error to view this as demonstrating that Goulet believed Michel an exemplary employee, it does demonstrate that he anticipated that Michel would remain and wanted him to be fairly compensated for his work.
Barrett, the Manager of the Conference Center, with overall responsibility for roughly 60 employees, discussed the plaintiffs’ performance on numerous occasions with Goulet, but he left those discussions simply with a sense that there had been a measure of deterioration in their performance. He recalled that there were some problems with their performance, mostly with the quality of the coffee they made and served.Prior to December 27, 1989, he, like Goulet, had never contemplated their dismissal, nor discussed with anyone their possible dismissal, nor concluded that their performance was so unsatisfactory as to warrant their dismissal.
The climax of these events occurred on December 27, 1989. The afternoon of December 26 was slow at the Conference Center, and the plaintiffs asked if they could leave early. Darocha asked them to stick around for a few minutes. They remained on the premises, but were not available when Darocha tried to find them, so Darocha had to deliver the afternoon coffee himself. [10] The next morning, when they arrived for work, Darocha angrily asked them where they had been the previous afternoon, saying he had been looking for them. They offered him an explanation that he found unsatisfactory. According to the plaintiffs, Darocha responded, “If you black guys do not want to work here, go home.” The conversation ended on that unfortunate note.[11]
Darocha vigorously denies that he said “black guys” or made any reference to the plaintiffs’ race. His denial is supported by Margaret Novick, who worked in the *204 kitchen, and claimed to have overheard the conversation. She testified that she was walking out of the kitchen and into the serving area, and saw Darocha engaged in conversation there with the plaintiffs. She claimed that she stopped and listened to the entire conversation. She said she was facing Darocha, who was only about ten feet away; the plaintiffs had their back to her. She testified that Darocha, after he heard the plaintiffs’ explanation for their absence, told them, in substance, “You can stay and work, though there is not much work, or you can go home.” According to her, Darocha never mentioned their race.
I find that Darocha did speak of the plaintiffs’ race. I do not credit the contrary testimony of Darocha and Novick regarding the racial reference, for three reasons. First, the plaintiffs were the only two black employees in the Conference Center, so it would not be surprising if Darocha thought of them as “black guys.” Nor would it be surprising if he blurted out that phrase in his disgust, anger, and exasperation with the plaintiffs. Nor would it be surprising that he would not wish to admit to having referred to them in those terms. Second, Novick’s testimony is not entirely credible, since she claims that she stood through the entire conversation, just ten feet away from Darocha, facing him, yet Darocha did not mention either to the investigating police officer or Barrett that she heard the whole thing. He would be silent on this matter only if he did not see her or did not think she would corroborate his version. Moreover, her description of what Darocha told them at the end of the conversation is not credible, since he was angrier than those words would reflect. Third, and most importantly, the plaintiffs were not prone to running to the police for frivolous reasons; they had called the police in to investigate only once before, after the third graffiti incident. It is not likely, as Factory Mutual contends, that they called in the police to divert Factory Mutual from addressing their own misconduct of being unavailable on the afternoon of December 26; they had been more severely criticized before on the job without bringing the police in. Rather, it is far more likely that they heard some reference to the color of their skin and, since this was the first time they had heard such a reference from any supervisor, connected it somehow in their own minds to the earlier graffiti incidents. They recognized that Darocha had not written the graffiti and was not responsible for it having been written, but nonetheless saw this as a continuation of what they viewed as racial epithets in the workplace, this time coming directly from a supervisor.
Breneville and Michel spoke briefly and agreed that they wanted the police to hear what they regarded as a racial slur made by one of their supervisors. Michel then immediately reported the matter to the Norwood Police Department by telephone. A Norwood police officer responded promptly to the call, and spoke with the plaintiffs and Darocha. As he was leaving, Novick asked to speak to him to give her version. The police officer took no further action but advised the plaintiffs to notify their superiors of the incident.
Breneville claimed he was dizzy and asked the police officer to take him to the emergency room of Norwood Hospital, which he did. There he was evaluated for back pain. Later that morning, he returned to Factory Mutual with a note from his doctor asking Factory Mutual to allow him three days rest. Barrett told him to go home and report to the Personnel Department after the first of the year.
Barrett was at home on the early morning of December 27 when he was called by the front desk of the Conference Center and told that the police were there. In light of the call, he decided to come to work early that morning. When he arrived, the police had gone, as had Breneville, so he spoke individually with Michel and Darocha, learning their conflicting accounts. He then received a message that someone who worked for John Love, Factory Mutual’s President and Chief Executive Officer, had called to ask what had happened at the Conference Center. He had yet to speak with Breneville, and was still sorting out what had happened himself, so he did not respond immediately to the call. When Breneville returned from the hospital, Barrett spoke with him, and learned his version, which mirrored Michel’s. He did not speak with Novick, because he understood that no one else had been present for the conversation. After listening to the competing accounts, he did not reach any conclusion as to whether or not Darocha indeed had mentioned the plaintiffs’ race in anger that morning.
Before Barrett responded to the first telephone call, Barrett received a second telephone call from someone in President Love’s office, instructing him to come immediately to a meeting at President Love’s office and to bring Darocha with him. He went to Goulet’s office and grabbed Goulet’s files on the plaintiffs; he did not have time before the meeting to review these flies. He did not grab Goulet’s file on Darocha or review it in Goulet’s office.
When Barrett and Darocha arrived at the meeting in President Love’s conference room, they found Love, Legal Counsel Olshan, and an unidentified employee from the Personnel Department already there. Neither of the plaintiffs were invited to the meeting and neither attended. At the meeting, Love asked the questions, primarily of Barrett. Love asked him what had happened, and Barrett related the conflicting stories he had heard from the plaintiffs and Darocha. Barrett did not provide any findings or conclusions as to what had truly happened. Indeed, Olshan made some comment that it was not proveable whether or not Darocha had made any reference to race. Love then asked what sort of workers the plaintiffs were. Barrett then quickly perused their files and glanced at some handwritten notes regarding the plaintiffs’ performance problems in recent months. All of Barrett’s file review took place in a few moments, with Love waiting for an answer to *205 his question. Barrett, therefore, did not have time to read the handwritten notes in anything more than a cursory way before he gave his answer, and he never saw either of the plaintiffs’ Promotion Potential Records. Barrett told Love that there had been lots of performance problems in recent months. He did not distinguish between Michel and Breneville; both were lumped together in this general statement. He offered no details, and no one asked for any details. Love asked why these people were still employed at the Conference Center if their performance was as described, and ended the meeting.
Barrett left the meeting suspecting that the plaintiffs were going to be fired. He had not contemplated firing them before December 27, and did not even intend to fire them when he left Love’s meeting. Rather, he was thinking about how he would address the problem; he contemplated the need both for additional investigation of the incident and for some way to work out the apparent personality conflict. Later that day, Barrett’s suspicions were confirmed; he received a telephone call from the Legal Counsel’s Office asking him to sign the termination letters. Although Barrett had not suggested their termination, he did not oppose it. He signed separate letters to the plaintiffs informing them that their employment was terminated, effective December 28, 1989, “because of ongoing unsatisfactory work performance." Barrett had never before described the plaintiffs’ performance as “unsatisfactory,” even at the meeting with Love, but he believed there was support for that conclusion in their files and from his discussions with Goulet.[12] The plaintiffs were given five days severance pay.
Barrett telephoned Goulet at home to inform him that these two employees had been terminated. Goulet did not participate in the decision to fire them.
Barrett then personally brought the bad news to Michel. He gave Michel the letter and asked him if he understood it. Michel said he did. Barrett then told him that it was for the best, because it would be difficult for them to continue to work at Factory Mutual.[13] The letter to Breneville was delivered to his home the next day.
Conclusions of Law
As stated earlier, the plaintiffs have articulated three separate claims, all brought under G.L.c. 151B, §4;
1. that Factoiy Mutual failed to act reasonably in addressing the three instances in which racial graffiti targeted at them was written on the walls of the employees’ men’s room;
2. that Factoiy Mutual harassed them because of their race and national origin, and in retaliation for their complaints about the racial graffiti, by adding new and unpleasant duties to their workday; and
3. that Factory Mutual terminated them from employment because of their race and national origin, and in retaliation for their calling the police to complain about their immediate supervisor’s use of racially denigrating language.
I will address each claim in turn.
1. Did Factory Mutual fail to act reasonably in addressing the three instances in which racial graffiti targeted at the plaintiffs was written on the walls of the employees’ men’s room?
Under G.L.c. 151B, §4(1):
It shall be an unlawful practice [f]or an employer, by himself or his agent, because of the race, color, [or] national origin ... of any individual ... to discharge from employment such individual or to discriminate against such individual in compensation ... or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.
An employer is vicariously liable under Chapter 15 IB “for discrimination committed by those on whom it confers authority” — its supervisory personnel. College-Town, Division of Interco, Inc. v. Massachusetts Commissions Against Discrimination, 400 Mass. 156, 165 (1987). While the plaintiffs concede that there is no evidence that supervisory personnel at Factory Mutual wrote any of the despicable racial graffiti, they contend that Factory Mutual committed discrimination, based both on race and national origin, for failing to take reasonable steps to respond to these graffiti incidents. College-Town, 400 Mass. at 167 (employer has affirmative obligation to remedy a known discriminatory situation).
I find that Factoiy Mutual responded reasonably to these three incidents. After the first incident, the plaintiffs’ immediate supervisor promptly spoke to them about it, reassured them that Factoiy Mutual found the graffiti intolerable, and urged them not to let it affect their work. The graffiti was promptly painted over. While no formal investigation was conducted at that time as to who was responsible for writing it, this was reasonable in view of the difficulty of any such investigation, its expense, and Factoiy Mutual’s belief (reasonable, but mistaken) that it was not likely to recur. When the second graffiti emerged, Factoiy Mutual appropriately escalated its response. It organized two meetings to ensure that all employees at the Conference Center knew of the problem, respected its seriousness, and cooperated in finding the culprit. When the third graffiti was written, with its even uglier, more targeted hate message, Factory Mutual recognized the need to bring in an outside investigator to conduct interviews and arrange for handwriting analysis. Factoiy Mutual’s efforts eventually bore fruit; Myers reported Henneberry’s confession promptly to his superiors, and handwriting analysis later confirmed that Henneberry was the wrongdoer. Even before the final handwriting analysis *206 was received by Factory Mutual, it forced Henneberry to resign his employment to avoid being fired.
While Factory Mutual’s response to the graffiti incidents may not have been perfect, it was certainly reasonable. It constituted a competent, good faith effort, both to communicate to all employees, including the plaintiffs, that Factory Mutual found the graffiti intolerable, and to identify the person responsible for the graffiti and remove him from the workplace.[14]
2. Did Factory Mutual harass the plaintiffs because of their race and national origin, and in retaliation for their complaints about the racial graffiti, by adding new and unpleasant duties to their workday?
While the plaintiffs' first claim focused solely on allegations of discrimination based on race and national origin, this second claim alleges that Factory Mutual, through their-Group Supervisor, Jorge Darocha, both discriminated against them and retaliated against them for complaining about the racial graffiti by adding new and unpleasant duties to their workday.
G.L.c. 151B never uses the word “retaliation,” but provides employees with protection from employer retaliation through two separate, but related provisions. Under G.L.c. 151B, §4(4), “It shall be an unlawful practice [flor any . . . employer ... to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter . . .” G.L.c. 151B, §4(4A) provides similar protection through different language, stating in pertinent part, “It shall be an unlawful practice [flor any person to . . . interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter ...”
It is essentially undisputed that Darocha became the plaintiffs’ immediate supervisor on July 17, 1989 and, shortly thereafter, began giving them duties beyond serving coffee and pastries to Conference Center guests. I do not find that Darocha’s assignment of these duties was motivated to any degree by the plaintiffs’ race or national origin, or was in retaliation for their opposition to any discriminatory practice.
Although the plaintiffs thought of themselves as “coffee servers” and were generally known to others in the Conference Center as the “coffee servers,” their formal job description was “utility worker,” with duties that went beyond serving coffee. There is no evidence that the additional duties that Darocha asked them to perform went beyond the scope of a utility worker’s job description. Nor is there any evidence that the assignment of these duties was intended to demean the plaintiffs or induce them to leave their employment. Rather, I find that these were tasks that needed to be done in the kitchen, and that Darocha thought that the plaintiffs should do them.
The only evidence the plaintiffs can adduce that Darocha’s assignment of these duties was motivated by their race or national origin is his reference to “you black guys” on December 27. They point to no other words or conduct that even arguably suggest racial animus. I do not find this evidence sufficient to show by a preponderance of the evidence that Darocha’s assignment to them of extra duties was motivated to any degree by their race or national origin.
Nor do I find that he assigned them extra duties to retaliate for their complaints about the racial graffiti. Darocha probably began to assign them these duties before the second graffiti incident; he certainly assigned them before the third incident, which triggered the police inquiry and the corporate internal investigation. Prior to the third incident, the plaintiffs had done virtually nothing about the graffiti except express their justified displeasure to their superiors. It is not credible that Darocha sought to retaliate against them for taking such modest steps to oppose plainly indefensible conduct.
3. Did Factory Mutual terminate the plaintiffs from employment because of their race and national origin, or in retaliation for their calling the police to complain about their immediate supervisor’s use of racially denigrating language?
Like the plaintiffs’ second claim, this third claim alleges discrimination on the basis of race and national origin, and retaliation. Specifically, the plaintiffs contend that Factory Mutual terminated them from employment on December 27, 1989 because of their race and national origin, and because they had complained to the police earlier that day about Darocha’s comments to them. For reasons that will be plain later, I will address the retaliation claim first.
a. The Claim of Retaliation.
To succeed on a claim of retaliation, “the plaintiff must prove that [he] reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination, that [he] acted reasonably in response to [his] belief, and that the [employer’s] desire to retaliate against [him] was a determinative factor in its decision to terminate [his] employment.” Tate v. Department of Mental Health, 419 Mass. 356, 364 (1995). See also Melnychenko v. 84 Lumber Co., 424 Mass. 285, 293 (1997). The plaintiff need not show that he was terminated solely because of retaliation. Dartt v. Browning-Ferris Industries, Inc., 427 Mass. 1, 7 (1998). Rather, the phrase “because of’ in G.L.c. 15IB, §4 means that, but for the retaliation, he would not have been terminated. See id. at 11 and n. 18; McCormack v. Boston Edison Company, 423 Mass. 652, 662 (1996).
I find that, but for the plaintiffs’ complaint to the police about Darocha’s racial reference, they would not have been terminated on December 27, 1989. Before that fateful day, Darocha, Goulet, and Barrett *207 had justifiable concerns about their job performance, but there was no discussion or even contemplation of their dismissal. Goulet just six days earlier had forwarded to Barrett the paperwork needed to support a raise for Michel. Even if one credits his testimony that he was seeking simply to increase Michel’s wage to match Breneville’s, this is hardly the step a supervisor takes in preparation for an employee’s termination. Yet, by the close of business that day, they had both been terminated, ostensibly for “ongoing unsatisfactory work performance.”
There can be no doubt that, had President Love not seen the police car that morning and asked about the incident, the plaintiffs would not have been fired that day. Factory Mutual contends, however, that their performance was indeed unsatisfactory and that President Love, once he learned from Barrett how poorly they had performed, suggested that they should be fired, which suggestion was effectuated by subordinates eager to please their boss. President Love contends that he did not care about the police visit; indeed, he said he was relieved that the visit did not result from the report of a theft. He testified that he simply understood that the plaintiffs had a record of poor performance and recommended that they be terminated.
I do not find it credible that retaliation played no role in President Love’s decision to fire the plaintiffs. By the time Love called the meeting to discuss the police visit, he had to have known something about what caused the police to come to the Conference Center. His office had inquired about the police visit earlier that morning and it is not reasonable to believe that no one reported back to the President’s Office what had happened. Certainly, someone from his office had to have known enough about it to invite Darocha to the meeting; if the police had simply been responding to a theft, Darocha would have had no place at the meeting.
Love, despite his protestation, was upset enough about the police visit that he had interrupted his workday, brought in his Legal Counsel and someone from Personnel to his office, and waited there for Barrett and Darocha to arrive. The presence of Legal Counsel and a representative from Personnel meant that he anticipated taking some personnel action; they would not need to be present simply to learn about the police visit. Moreover, it is clear that the personnel action was to be targeted against the plaintiffs, not Darocha, since Darocha was invited to the meeting and the plaintiffs were not.
During the meeting, no conclusion was drawn as to what truly had been said that morning between Darocha and the plaintiffs; Barrett said he could not make any conclusions from the conflicting evidence and Legal Counsel Olshan declared during the meeting that it was not proveable whether Darocha had made the racial reference. Love’s inquiry of Barrett about the performance of the plaintiffs cannot be understood to be an attempt to sort outwhose account was reliable, since he never asked about Darocha’s performance.
Nor is it reasonable to conclude that Barrett’s discussion of their performance convinced Love that they should be terminated for poor performance; Barrett told them far too little to permit any such conclusion. Barrett had the plaintiffs’ files with him at the meeting, but he had not looked at them before Love asked him what sort ofworkers they were. Barrett, who had never before met with Love in his office (and never did again), was surely not going to spend a great deal of time reviewing those files while Love was waiting for a reply. Rather, he simply said that there had been lots of performance problems in recent months. I do not find that he provided many details, both because he said he did not and because he would not reasonably have been able to pull those details from the files in time. Love did not press Barrett for any details; he wanted to fire the plaintiffs, he now had the information he wanted to do that, and he immediately communicated that they should be fired. He did not use those words but he did not need to; Olshan knew what Love wanted and he made sure that Love got it by having his office, not Barrett’s, prepare the termination letter.
It is simply not believable that the plaintiffs were fired solely because of their past performance. Factory Mutual had a procedure to address a history of past performance for its employees, consisting of discussing with the employee his work problems, then giving an oral warning if the problems were not addressed, then, if the problems persisted, giving a written warning, and finally, if all else has failed, terminating the employee. These steps were not taken with respect to the plaintiffs. Moreover, if their performance was truly at issue, their supervisors — Goulet, Barrett, and Darocha — would be consulted as to the problems with their performance and the need for termination. Love discussed these matters with none of these supervisors, even though two were sitting in his conference room when he made the termination decision. Finally, in a corporation like Factory Mutual, with 2,000 employees, the Chief Executive Officer does not generally become involved in evaluating the work performance of two coffee servers and making a personnel decision regarding them.
Something else was going on in Love’s mind. I find by a preponderance of the evidence, based on the circumstantial evidence and reasonable inferences drawn from that evidence, that the police visit to the Conference Center on December 27, 1989 triggered Love to conclude that the plaintiffs were trouble and, since they had performance problems, that they were more trouble than they were worth. They had been trouble because the racial graffiti targeted against them meant tension at the Conference Center, the investment of management time to deal with the prob *208 lem, and the investment of corporate funds to pay for the private investigation. They were more trouble that morning because they had caused a visit by the police, which did not go unnoticed in a suburban conference center. He anticipated that their continued presence was likely to mean more trouble and he did not have the patience to deal with that. If their performance had been stellar, he may not have fired them, but when Barrett gave him an opening by discussing performance problems, he seized upon it and made sure they were gone from Factory Mutual immediately.
Having found that the plaintiffs’ telephone call to the police on December 27 was a determinative cause of their termination, I must now determine, under Tate, whether that telephone call to the police was:
b. the result of a reasonable and good faith belief that Factory Mutual was discriminating against them, and
c. a reasonable response to that belief.
I find, given the circumstances of this case and these plaintiffs, that both elements were satisfied.
I earlier found that Darocha, in anger, referred to the plaintiffs as “you black guys.” I And, with greater confidence, that the plaintiffs believed he said this to them. While such a comment may not in many circumstances cause an employee to believe that he is a victim of race discrimination, the plaintiffs reasonably and in good faith believed that this particular comment was a verbal reflection of race discrimination, a slip of the tongue that demonstrated Darocha’s intention to discriminate against them on the basis of their race. The plaintiffs at the time were emotionally vulnerable as a result of having been the target of the racial epithets in the three graffiti incidents, so they were sensitive to anything that would bespeak racial animus. Moreover, they believed, albeit mistakenly, that Darocha was burdening them with additional, demeaning work, and they suspected that their race may have been a reason why they were being given these new tasks. Moreover, Darocha was angry at them that morning for reasons that they thought both unfair and a contrivance, and the racial reference made them worry that they were being set up to fail because of their race. This frightened them, both because of the proximity in time of the graffiti incidents and because these comments were being made by their supervisor. Being unsophisticated in seeking redress within a workplace they distrusted, they instinctively turned to the authority whose impartiality and integrity they had confidence in — the police. In their minds, this was a civil rights complaint, and they treated it like a civil rights complaint. While someone born in this country, with more experience in these matters, may have pursued a different course, and complained to someone other than the police, I do not find that telephoning the police, under these circumstances, was an unreasonable response to their belief that they were being victimized because of their race. See Bain v. Springfield, 424 Mass. 758 (1997) (upholding juiy verdict of retaliation where Mayor was angry that the plant superintendent of waste water treatment plant had complained directly to him about discrimination in hiring of water department manager).[15]
b. The Claim of Race and National Origin Discrimination.
I do not find that Factory Mutual was motivated by race or national origin in dismissing the plaintiffs from employment. If they had suffered in silence, Factory Mutual would not have fired them on December 27. It was their complaints of discrimination, not the color of their skin or the nation of their birth, that caused their dismissal.
I also find that Factory Mutual’s explanation that it fired them solely because of their job performance is, in part, a pretext. Their job performance was one of the reasons for their termination. Indeed, I find that it was a necessary reason in that, if their performance had been superb, they would not have been fired. But it was not a sufficient reason — but for their telephone call to the police, they would not have lost their jobs that day.
In view of the Supreme Judicial Court’s decision in Blare v. Husky Injection Molding Systems Boston, Inc. regarding employment discrimination in violation of Chapter 15IB, I must consider whether my finding of pretext mandates a finding of discrimination on the basis of race and national origin even when I find that considerations of race and national origin did not motivate their termination. Blare v. Husky Injection Molding Systems Boston, Inc., 419 Mass. 437 (1995). Compare with Dartt v. Browning-Ferris Industries, Inc., 427 Mass. 1 (1998); Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122 (1997).
In Blare, the Supreme Judicial Court declared:
(O)nce a plaintiff has established a prima facie case and further shows either that the employer’s articulated reasons are a pretext or by direct evidence that the actual motivation was discrimination, the plaintiff is entitled to recovery for illegal discrimination under G.L.c. 151B.
Blare, 419 Mass. at 444-45. If a finding of pretext mandates a finding of discrimination, then I must find race and national origin discrimination even when I do not find that Factory Mutual was motivated by these considerations. Indeed, if a finding of pretext mandates a finding of discrimination, then discrimination must be found even when the factfinder concludes that the plaintiffs would have been fired regardless of their race or national origin.
Taking it one step further, if a finding of pretext mandates a finding of discrimination, then a finding of discrimination would generally be mandated in any case where discrimination and retaliation were both alleged, and retaliation was found, unless the employer’s proffered reason for its employment deci *209 sion was to retaliate against the plaintiff, because only-then would the proffered reason not be found pretextual. In addition, whenever more than one species of discrimination under Chapter 151B is alleged, a finding of pretext would mandate a finding of discrimination as to all.
I do not believe that I am mandated by Blare to find race and national origin discrimination when I find pretext but also find that the defendant was not motivated by the race or national origin of the plaintiffs in their termination. The question before the Supreme Judicial Court in Blare was whether summary judgment was warranted on a claim of age discrimination when there was evidence sufficient to prove pretext. Its holding must be viewed in the context of summaiy judgment — a finding of pretext is sufficient, by itself, to support a finding of discrimination. Consequently, the language in that case intimating that a finding of pretext mandates a finding of discrimination (otherwise phrased, that a finding of pretext yields a conclusive presumption of discrimination) must be viewed as dictum rather than controlling precedent. Since Blare had not even reached trial before it came before the Supreme Judicial Court, the question of what precise question the jury should be asked in the verdict form was hardly ripe for resolution.
Moreover, later in Blare, the Supreme Judicial Court wrote:
Blare then had to produce evidence sufficient to support a jury verdict that it was more likely than not that the articulated reason was pretext for actual discrimination.
Id. at 447 (emphasis added). Similar language indicating that pretext simply provides a strong inference of discrimination was declared by the Supreme Judicial Court two years after Blare in Matthews, 426 Mass. at 128, where it observed that the burden falls on the plaintiff to prove “that the defendant’s proffered reason for its employment decision was not the real reason, but is a pretext for discrimination" (emphasis added).
In addition, G.L.c. 151B, §4(1) provides that it is an unlawful practice only to discharge an individual “because of the race, color, . . . national origin . . . of [the] individual.. .” (emphasis added). Mandating a finding of discrimination based on a finding of pretext when the factfinder also finds that the individual was not discharged because of his race, color, or nationál origin appears contrary to the language of this statute. I note that the Supreme Judicial Court still embraces the “but for” requirement in Chapter 15IB discrimination cases. It recently endorsed jury instructions that required the plaintiff in a discrimination case to prove that, but for the plaintiffs handicap, he would not have been terminated. Dartt, 427 Mass. at 11. See also Brunner v. Stone & Webster Engineering Corp., 413Mass. 698, 699 (1992) (“Inac. 15 IB case involving an assertion of sexual discrimination in employment, the plaintiff has the burden of persuading the fact finder that the employer intentionally discriminated against him or her on account of sex, and that, but for the discrimination, the employer would not have taken the complained-of action”), and cases cited.
For all these reasons, I join the First Circuit in its recent conclusion, en banc, that “we are far from sure that Massachusetts now requires a jury to be told that if it finds pretext, it must decide the case in favor of the plaintiff." McMillan v. Massachusetts Society for the Prevention of Cruelty to Animals, 1998 WL 327990 (1st Cir. June 16, 1998) (en banc). Indeed, I find that a finding of pretext does not mandate a finding of discrimination. Consequently, I find that Factory Mutual engaged in unlawful retaliation in violation of G.L.c. 151B, §4 but not race or national origin discrimination.
4. Damages
Having found Factory Mutual liable for retaliation, I must now address the issue of damages. The plaintiffs seek compensatory damages for lost wages from December 28, 1989 to date, and for emotional distress. They do not seek punitive damages, acknowledging that punitive damages are not recoverable for acts of retaliation that occurred before 1990. Fontaine v. Ebtec Corp., 415 Mass. 309, 317-20 (1993).
Mr. Michel was earning $7.50 per hour when he was terminated. Although looking for employment, he was out of work until October 2, 1990, when he found full-time employment at the Carlyle Nursing Home in Framingham at a wage of $8.00 per hour. He remained at this job until October 6, 1991, when he was terminated for cause. I find that his entitlement to back pay ended when he obtained this comparable employment at a higher rate of pay. See generally Ryan v. Supt. of Schools of Quincy, 374 Mass. 670, 672 (1978). Consequently, I find that Michel is entitled to back pay for nine full months, totalling $12,150, minus the $4,770 he received during this period in unemployment compensation, for a total of $7,380 in back pay.
Mr. Breneville was earning $7.59 per hour when he was terminated. Although he, too, sought other employment, he did not find work until August 25, 1990, when he obtained full-time employment with the United States Postal Service, at a wage of $7.50 per hour. In September 1990, he became a full-time student at Roxbury Community College, and began working only part-time at the Postal Service in order to leave time for his studies. I find that his entitlement to back pay ended entirely when he became a full-time university student, and was limited to the $.09 per hour differential in wages once he found work at the Postal Service. See, e.g., Miller v. Marsh, 766 F.2d 490 (11th Cir. 1985). Consequently, I find that Breneville is entitled to back pay for nearly nine full months, totalling $12,148, minus the $4,560 he received during this period in unemployment compensation, for a total of $7,588 in back pay.
*210 I also find, based on the testimony of both Michel and Breneville, that each is entitled to $30,000 as fair monetary compensation for the emotional distress they suffered as a result of their retaliatory terminations. I note from their testimony that the emotional distress suffered by each of the plaintiffs was increased by their recognition that Henneberry, the person who Factory Mutual believed wrote the racist graffiti, was given the courtesy of being allowed to resign, while they, the targets of that graffiti, were not given that courtesy and were instead summarily terminated during the Christmas season.
Under G.L.c. 151B, §9, having found for the plaintiffs on their claim of retaliatory termination, I am obliged to award the plaintiffs “reasonable attorney’s fees and costs unless special circumstances would render such an award unjust.” The plaintiffs shall submit their request for reasonable attorneys fees and costs by October 16, 1998, and the defendant shall submit any opposition no later than October 27, 1998.
ORDER
For the reasons stated above, it is hereby ORDERED that:
1. Judgment shall enter in favor of the defendant Factory Mutual on Count One, alleging race and national origin discrimination under G.L.c. 15IB, §4;
2. Judgement shall enter in favor of the plaintiffs Michel and Breneville on Count Two, alleging retaliatory termination in violation of G.L.c. 15IB, §4.
3. Compensatory damages shall be awarded in the amount of $37,380 for Michel and $37,588 for Breneville.
4. The plaintiffs Michel and Breneville shall be awarded “reasonable attorneys fees and costs unless special circumstances would render such an award unjust.” The plaintiffs shall submit their request for reasonable attorneys fees and costs by October 16, 1998, and the defendant shall submit any opposition no later than October 27, 1998.

Although Breneville was known to all as a coffee server, his formal job title was utility worker, with a job description that went beyond serving coffee and pastries.

Breneville and Michel did not know each other until Michel joined Factory Mutual’s employ.

Nhis rating applied only to employees in new positions.

The Conference Center had an outdoor swimming pool for its guests.

Both Breneville and Michel understood Goulet to have said that the graffiti incident was no big deal. I find that Goulet did not intend to diminish the significance of the graffiti, but did wish for them to not dwell on it and allow it to interfere with their performance and their relationships with other staff.

As a matter of corporate policy, Factory Mutual would not comment on a past employee’s performance in response to an inquiry from a prospective employer, regardless of how well or poorly that employee had performed.

This meeting appears to have begun on the wrong foot. The plaintiffs asked the investigators what they had learned in their investigation, and the investigators said they could not tell them, since Factory Mutual was their client, not them. The plaintiffs did not understand the reason for the investigators’ position and viewed them as foes rather than friends. They did not feel comfortable discussing the case with them and clammed up: the investigators, no doubt displeased with being called to a meeting by people who had nothing to say to them, did not pursue the inquiry and the meeting ended prematurely to no one’s satisfaction.

Barsanti had resigned roughly a month earlier, and she was replaced briefly as group leader by Jimmy Kasailes. The plaintiffs appear to have gotten along with both these supervisors without incident.

Michel did not believe that the person who handles coffee and pastries for Conference Center customers should be handling garbage at the same time.

Both plaintiffs testified that they waited right in front of Darocha until they left, and that there was no work to do. I do not credit their testimony. Darocha was plainly angry with them the next morning and there was no reason for him to be angry if they had acted as they claim. There was no evidence that Darocha was irrational as a supervisor, so I believe that his anger was genuine. Moreover, in his opening statement, plaintiffs’ attorney claimed that the plaintiffs had indeed left a bit early that day, leaving some time between 2 and 2:30 p.m.. It was only when the plaintiffs saw their time sheets, which revealed that Breneville had left at 2:32 p.m. and Michel at 2:27 p.m., that they realized that they had not left early. I believe that their faulty memory is best explained by their being unavailable shortly after 2 p.m., but still somewhere on the premises.

 The plaintiffs contend that they told him he should not raise the issue of race after the three incidents of racial graffiti, but I do not credit their testimony. These supposed comments were not mentioned either to the police that same day or in their depositions, but were recalled for the first time at trial. I believe that they have confused what they were thinking of at the time with what they said at the time.

“Unsatisfactory” was a term of art at Factory Mutual under its performance appraisal system.

 Michel testified that, while breaking the news to him, Barrett told him he was calling the police all the time because of Michel, and that tension was rising. I do not find that these words were used. Barrett denies it, and I find him more credible than Michel on this issue, especially since Michel did not include this comment, which would be plainly relevant to the retaliation claim he had brought, in his answer to interrogatories regarding this encounter.

Since I find no discrimination on this claim, I need not address Factory Mutual’s separate procedural argument that the plaintiffs’ claim should be dismissed for failure timely to allege it in their complaint with the Massachusetts Commission Against Discrimination as required under G.L.c. 15IB, §9.

In addition, I note that, while Factory Mutual now contends that the plaintiffs acted in bad faith by telephoning the police, ostensibly to create a diversion from their misbehavior the previous afternoon, this argument was never made at the time and was never claimed to be a reason for their dismissal. This is not a case where an employer, after a fair and diligent inquiry, concluded that an employee had made false or bad faith allegations of discrimination, or acted unreasonably in response to an honestly held belief of discrimination, and sanctioned the employee for that misconduct. Rather, here, the employer contends that the plaintiffs’ complaint of discrimination played no role in their dismissal.